IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THOMAS JACKSON,

    Petitioner,                                   No. CIV S-09-989 LKK CHS P

    vs.

JOHN W. HAVILAND, et al.,

    Respondents.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I. INTRODUCTION

Petitioner Thomas Jackson is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner is currently serving a sentence of life with the possibility of parole following his 1978 first degree murder conviction in the Orange County Superior Court. Here, petitioner does not challenge the constitutionality of that conviction, but rather, the execution of his sentence, and specifically, the May 8, 2008 decision of the Board of Prison Terms that he was not suitable for parole. Based on a thorough review of the record and applicable law, it is recommended that the petition be denied.

## II. BACKGROUND

The basic facts of petitioner's life crime were set forth by the Orange County Superior Court on review of his state petition for habeas corpus:

1

> In 1978, Petitioner was found guilty by a jury of first degree murder, attempted murder and burglary with great bodily injury. Petitioner and three others had gone into an apartment and attacked one male victim by beating him over the head with a pistol. The victim broke free and attempted to escape whereupon he was captured and stabbed to death by Petitioner. The victim sustained approximately 35 stab wounds. The group bound and gagged a second victim, a female. [Petitioner] slashed her throat several times and [his crime partners] stabbed her in the back five or six times. She survived. The perpetrators then left the apartment, taking with them two other people and one six-year-old boy. Petitioner was 19 years old at the time of the crimes. He was sentenced to life with the possibility of parole.

(Pet., Ex. 27 at 1.)

Petitioner's minimum eligible parole date passed on April 7, 1984. On May 8, 2008, a panel of the Board of Prison Terms ("Board") conducted a hearing to determine petitioner's suitability for parole and concluded that he was not suitable for parole.

Petitioner challenged the Board's decision in the Orange County Superior Court; his claims were denied in a written decision dated October 13, 2008. The California Court of Appeal, Fourth District, summarily denied petitioner's claims on appeal, and the California Supreme Court denied review.

### III.  CLAIMS FOR REVIEW

Petitioner contends that the Board's 2008 decision was unsupported by any relevant, reliable evidence in the record and was arbitrary in violation of his right to due process of law. He also contends that his due process rights were violated because the Board violated the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by improperly extending his term beyond the statutory minimum. Finally, petitioner claims that the Board acted in excess of its authority granted under the California Penal Code.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## V.  DISCUSSION

### A.  Due Process of Law

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, if a state's statutory parole scheme uses mandatory language, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional

liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).

California Penal Code section 3041 sets forth the legislative standards for determining parole for life-sentenced prisoners such as petitioner. Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel... shall meet with the inmate and shall normally set a parole release date." Cal Penal Code §3041(a). Subsection (b) provides an exception to the regular and early setting of a lifer's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration..." Cal. Penal Code §3041(b). The Ninth Circuit has accordingly determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16.

Additionally, as a matter of *state* constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, No. 06-55392, slip op. at 34-35 (9th Cir. April 22, 2010) (en banc) (citing *In re Rosenkrantz*, 59 P.3d 174, 210 (Cal. 2002), *In re Lawrence*, 190 P.3d 535, 549 (Cal. 2008), and *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008)). The federal Due Process Clause requires, in turn,

4

that California comply with its own quantum of evidence requirement. *See Hayward v. Marshall*, No. 06-55392, (Berzon, J., concurring in part and dissenting in part at 13). In *Hayward*, the Ninth Circuit Court of Appeals directed reviewing courts in this circuit to "decide whether the California judicial decision approving the... decision rejecting parole was an "unreasonable application" of the California 'some evidence' requirement, or was "based on an unreasonable determination of the facts in light of the evidence." *Hayward Marshall*, slip op. at 37.

The analysis of whether some evidence supports denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851. This court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle." *Id*.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. §2402(b). The regulation also lists several specific circumstances which tend

to show suitability or unsuitability for parole. 15 Cal. Code Regs. §2402(c)-(d). The overriding concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. Thus, the proper articulation of the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008). In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th at 1227.

Here, the Board concluded that petitioner was not yet suitable for parole and that he would pose an unreasonable risk of danger to society or a threat to public safety if released. The presiding commissioner stated:

> We think you're making good progress... With that being said, we considered many factors this afternoon. We certainly considered the gravity of the commitment offense. This was a -- This was a horrendous crime. The Panel noted that it was carried out in an especially cruel and callous manner in that our first victim on March 29, 1977, James Harbin, was first hit in the head with a weapon and then ultimately stabbed a total of 35 times while he was being held by your crime partners; you being the person doing the stabbing. We had multiple victims that were attacked. One was injured. Obviously, Mr. Harbin we've already discussed died as a result of his wounds. Victim Sandra Cree had her throat slashed five to six times while tied to a banister. At that time was left as it was assumed that she had died as a result of the throat slashing. Returning later only to identify that she hadn't died and the victim was stabbed an additional five to six times in the back. The victim did survive. The Panel noted that the offense was carried out in a very dispassionate and calculated manner, almost in the fashion of an execution-style murder, in that you went to the apartment with full knowledge that there was going to be harm falling to victim Harbin. You also knew that there had been discussions prior to getting to the apartment that the witness or victim Cree was going to need to be eliminated. The Panel also noted that all of this occurred in front of a child. The Panel noted that the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering and this is based on the Panel's conclusion of the shear (sic) nature and magnitude of the stab wounds that the victims sustained. The motive for this certainly is trivial. It was a desire to fit into this criminal enterprise and I'll have some more comments about the

criminal enterprise later.  Conclusions being drawn from a Statement of Facts that were contained in the probation officer's report that's been previously read into the record in detail and at this point will be adopted by reference.  The Panel noted with respect to your previous record you had none.  You had none as an adult and none as a juvenile.  The prior life, even though there had been some difficulty with your father, you seemed to have a good life.  Institutional behavior, you've done well institutionally.  The Panel noted the last counseling chrono October 10th of 1980, this was for a count, and that the total of three 115 discipline reports, the last being December 5th of '94 and that was for the misuse of a state computer.  The Panel noted that the recent psychological exam that was completed by Dr. Singh on May 22nd, 2007, that the doctor's report does note progress but essentially is an unfavorable report and there were several parts of the report that caught the panel's eye.  And one of which that does to a certain degree go in to the insight is your admission that you wanted to join the crime partners in their illegal activity, which motivated you to participate in this crime without knowing the purpose for the violence.  However, you reported at the time of the crime you remained on the periphery of any illegal activities in which the group was involved, so it almost seems that there's some conflicting issues.  Either that or you were looking to try to find some holy purpose for these totally unholy activities that these people were involved in.  We also noted that the doctor's concern with respect to the fact of the minimization of your actions and that you do pose a low to moderate likelihood to recidivate generally or violently if released back into the free community.  And the doctor does encourage to the extent it's available any kind of self-help particularly in the area of coming to grips with the issue of child abuse and whether that translated into your ability to use such deadly force on two human beings and the case of one human being using deadly force and on the other some potentially deadly force compounded by the fact that you had no history of this at all.  That's what makes it even more inexplicable.  Parole plans, we noted that you've got extremely strong family support in the State of Washington... We certainly do commend you.  I've gone back and I did review previous Board reports going back to '89 and '90 and essentially that you've been staying with the truth since that point, albeit at times probably painful for you.  And also for the fact that you haven't had any 115s since 1994, and that you bring great work reports to the Panel for their consideration.  However, these positive aspects of your behavior don't outweigh the factors of unsuitability... I did forget to note that the doctor did not give you what the Panel would consider to be a favorable conclusion with respect to the risk assessment...

(Pet., Ex. 25 at 95-101.)

/////

In concluding that petitioner was not suitable for parole, the Board appeared to rely heavily on the gravity of his commitment offense.  The gravity of an inmate's commitment offense can by itself be a sufficient basis for denying parole where the facts are especially heinous or particularly egregious.  *In re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53 (9th Cir. 2007).  There must, however, be some rational nexus between the facts of the commitment offense relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal.4th at 1214, 1227 ("the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or [ ] current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety") (emphasis in original).  The relevant inquiry is an individualized one: "whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." *In re Lawrence*, 44 Cal.4th at 1221.  The passage of time and attendant changes in the inmate's psychological or mental attitude are relevant considerations.  *Id*.

In this case, petitioner's commitment offense certainly fits the regulatory scheme for one that was committed "in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs. §2402(c)(1).  Specifically, as the Board noted, "multiple victims were attacked, injured or killed" (§2402(c)(1)(A)); the offense was "dispassionate and calculated... such as an execution-style murder" (§2402(c)(1)(B)); the offense demonstrated "an exceptionally callous disregard for human suffering" (§2402(c)(1)(D)); and the motive for the crime as explained by petitioner was an inexplicable or very trivial reason to commit first degree murder (§2402(c)(1)(E)).

8

Petitioner's offense occurred approximately 30 years prior to the 2008 parole suitability determination. A decision based solely on the gravity of a 30 year old commitment offense could potentially be arbitrary to the extent that the offense might no longer be probative to an assessment of the inmate's current or future dangerousness where there is strong evidence of rehabilitation. In this case, however, the Board cited additional, non-historical factors to support its conclusion that petitioner still posed an unreasonable risk of danger. The Board considered evidence that petitioner had minimized his participation in the offense and evidence that he still lacked insight into its nature and gravity. The Board also cited and relied on petitioner's most recent psychological report, which it characterized as essentially unfavorable.

A prisoner's "past or present attitude toward the crime" is properly considered in a parole suitability determination. 15 Cal. Code Regs. §2402(b). Petitioner was interviewed on May 22, 2007 for approximately two hours for the purpose of a psychological evaluation for his 2008 parole suitability hearing. Under the heading 'Inmate Understanding of Crime,' the evaluator wrote:

> Relative to the murder of Mr. Harbin and the attempted murder of Ms. Cree, Mr. Jackson stated that after moving to California from Chicago he'd met one of the crime partners, who'd introduced him to the others. He explained he was attracted to them because "they were living a lifestyle that I wanted to be a part of, pimping and pandering." On the day of the offense, he was at one of their homes and was asked to drive them to a specific apartment. During the drive, the discussion centered around, "somebody getting hurt and something had to be done to the female because she was going to snitch on us." He reported that he believed that he was only going to drive and that "whatever was going to happen, they (the crime partners) were going to do it." However, when they arrived, one of the crime partners told him it "was ok for me to go in because he knew the guy." After they were let in the apartment by Ms. Cree,
>
> "...all hell broke loose. George started beating Jimmy (Harbin) over the head with a .45, Sandra (Cree) tried to run upstairs. I followed her to the front room. Next thing I know, Jimmy is lying on the floor. George asked me to get a rag from the kitchen to wipe off his blood and he put it on Jimmy's head. After that, George told me to take Sandy upstairs and tie her up. I took her upstairs. I went into the bedroom. She suggested I tie her to the

railing, so I did. As I started to go downstairs, George and Gary were at the bottom; George had a knife in his hand. He handed me the knife and told me "do what you have to do." That's when I cut her throat. The next thing I know, Gary came up behind me with Jimmy. He told me to tie him up to the rail and I guess it was after I got him tied he saw Sandra, maybe he saw blood. He got loose; he and Gary were in the bedroom. George ran past me. Before that, I think I said something about the knife had broken. Gary had a bigger knife when he came up the stairs. At some point I ran into the bedroom, I had both knives and I started stabbing Jimmy. The next thing I know, each one of them had Jimmy by the arms and I kept stabbing him until he didn't move (*Mr. Harbin was stabbed 35 times*). Then, I went downstairs. George came downstairs and told me to tie up his (Mr. Harbin) hands, that time I know specifically it was with a telephone cord. And then, I heard him saying something in the hallway, that she wasn't dead. Gary poked her 15 times in the back. I got blood all over my hands from tying Jimmy up. After that, we left."

Shortly after the crime, Mr. Jackson returned to his parent's home in Chicago where he was soon arrested. Mr. Jackson reported that he didn't know the purpose of the assaults at the time. However, he heard in court that Mr. Harbin was a pimp and women in the apartment worked for him. One of the crime partners may have been involved with one of the women at the house, and Mr. Harbin "had slapped her around." He reported that all of the crime partners were convicted and as far as he knows they all remain in prison. Throughout his trial and for many years after, Mr. Jackson minimized his culpability in the offense. He claimed that he only participated in the assault and murder because he was afraid for his own safety. As a result, his account of the events that led to these offenses was considerably different than the prosecution's version. In 1990, there was a substantial change in Mr. Jackson's story, when he admitted to being a willing and active participant. This account is similar in many ways to the presentation of events made by the district attorney during trial. However, one substantial difference is that all of the defendants were described as being involved with prostitution and drug dealing. Mr. Jackson admitted that he wanted to join the crime partners in their illegal activities, and this motivated him to participate in this crime without knowing the purpose for the violence. However, he reported that at the time of the crime he remained on the periphery of any illegal activities in which the group was involved.

Mr. Jackson reported that he first became aware of pimps and prostitutes when, as a child, babysitters would take him and his siblings to their neighborhoods and he became fascinated with this lifestyle. He stated that his "favorite characters" on television shows from his youth were pimps. He stated that when he moved to California he'd hoped to become involved in this type of lifestyle. Although he approached several women, he stated that

> none would leave their boyfriends to work for him. During treatment in 1989, a treatment summary indicates that Mr. Jackson seemed to "hate women" and certainly his interest in pimping would suggest this might be the case. However, there was no documentation or support for the idea that he has worked on this issue.
>
> Mr. Jackson stated during the present interview that he believed the sentence given to him in this case was fair, since his actions resulted in the death of Mr. Harbin. He has repeatedly stated over the years that he believes that he remains incarcerated because his crime partners "were all black." Similarly, when he was first incarcerated he sought protective custody because he believed that the race of his crime partners would make him a target of other prisoners. As far as this evaluator could ascertain, the inmate has repeated this statement over the years, but it could not be determined whether he has actually had the problems he worried about. When asked during the present evaluation to explain this statement, he reiterated that he believed he was treated differently because of the race of his crime partners, but failed to clarify the statement any further.

(Pet., Ex. 24 at 5-6.)

The evaluator went on to find with respect to a risk assessment that "Mr. Jackson <u>does not</u> meet the criteria to be considered a psychopath, a personality trait linked to violent recidivism," however, his "risk of committing another violent act is <u>moderate</u>." (Pet., Ex. 24 at 8 (emphasis in original).) He explained:

> The most prominent *historical* factor is previous violence... Mr. Jackson's relationship instability, employment problems in the community and history of child abuse all contribute to elevation. [¶] *Clinical* items also raise some concern. Although Mr. Jackson has made considerable progress, since his arrest nearly 30 years ago in addressing his actions, he continues to minimize, to some degree, the harm he perpetrated by referring to the victims as "a pimp and prostitute." He has failed to fully appreciate the harm he perpetrated on humans, discounting them because of their unsavory profession. Mr. Jackson participated in individual and group psychotherapy for nearly a year in 1989 and received very positive feedback from the therapists about his work and insight. It is important to note that, at the time, he continued to blame his crime partners' threat to kill him as the motivation behind his offending, which he now recants. These acts were clearly impulsive and he has demonstrated only minimal problems with this impulsivity since his incarceration. [¶] The final domain is Risk Management. In the prison setting, for most inmates, many of the issues listed under this area are kept under control. Because he has spent more

> of his adult life in prison than in the free community, Mr. Jackson is at significant risk of having difficulty coping with stress and exposure to destabilizers.  He has few social supports in California, which exposes him to destabilizing factors.  He describes his elderly mother, who is having significant health problems, as his greatest source of future support.  The situation with his ex-wife and son remains unresolved and may also be a destabilizing factor.

(*Id*. at 8-9.)  The evaluator then noted that "Mr. Jackson's lack of problems with substance abuse, general criminal history (exception being the controlling offenses), and lack of pro-criminal attitudes all serve to lower his risk of general violence in the future." (*Id*. at 9.)

The evaluator concluded:

> In many ways, Mr. Jackson has made significant progress since his incarceration almost 30 years ago... [¶] However, several concerns remain.  For instance, Mr. Jackson continues to minimize the impact of his actions due to the alleged professions of the victims.  This makes it difficult to accept that he feels remorse for his actions, despite his statements to the contrary.  Mr. Jackson's willingness to participate in such carnage, in the absence of previous violence, has been a source of significant confusion to himself and others since this crime occurred.  Previous evaluators clearly opined that his past history of abuse as a child explains his actions.  Mr. Jackson did participate in therapy early in his incarceration.  Although the therapists noted progress, Mr. Jackson admitted that he likely did not receive maximum benefit due to his resistance (not admitting to his role in the offense).  Further treatment, thus, may be beneficial, especially if the focus were on the impact and consequences of his childhood trauma and how this influenced his personality development and subsequent relationships (including the relationships with his crime partners but also with the women in his life).  Anticipating, recognizing, and regulating his emotional reactions, especially when facing stressful and destabilizing situations, might be one way to prevent recidivism. [¶] Mr. Jackson poses a <u>low-moderate</u> likelihood to recidivate, generally or violently, if released into the free community.

(Pet., Ex. 24 at 9-10 (emphasis in original).)

Accordingly, there is some evidence to support the Board's conclusion that petitioner was not suitable for parole because he still posed an unreasonable risk of danger to society or a threat to public safety if released.  Although various positive factors appear in the record which are supportive of his release, this court is not authorized to weigh those suitability

12

factors, substituting its judgment for that of the Board. In this case, the gravity of petitioner's commitment offense and his past and present attitude toward the crime as explained in the 2007 psychological evaluation provide the required modicum of evidence to support the Board's 2008 denial of parole.

### B. Alleged Violation of *Apprendi v. New Jersey*

In *Apprendi v. New Jersey*, 530 U.S. 446 (2000), the United States Supreme Court held as a matter of constitutional law that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490.

In this case, petitioner was sentenced to an indeterminate term of 7 years to life in state prison; the statutory maximum for his sentence encompasses the possibility of life imprisonment. Petitioner's sentence has not been changed by the Board's actions because he is still eligible for parole. The Board's decision to deny petitioner parole based on factors not found by a jury does not increase the statutory maximum he faces. *See, e.g.*, *Strong v. Curry*, 2009 WL 857525 at 11 (N.D. Cal. 2009) ("*Apprendi* and its progeny have no application to the parole decision for a prisoner serving an indeterminate life sentence."); *Estrada v. Hartley*, 2009 WL 2915063 at 8 (E.D. Cal. 2009) (same). In any event, petitioner cites no federal authority for the proposition that the Board's repeated failure to find a prisoner suitable for parole violates the rights recognized in *Apprendi*.

### C. Alleged Violations of State Law

Despite his reference to the Fourteenth Amendment, petitioner's claim that the Board exceeded its authority under the California Penal Code provides no basis for federal habeas corpus review. *See, e.g.*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (state court's interpretation of state law binds a court sitting in habeas corpus); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

1985). The state courts' interpretation and analysis of the proper application of section 3041 of the California Penal Code and its implementing regulations cannot be challenged in this federal habeas corpus action.

## VI. CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 11, 2010

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE